```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
                      FORT WORTH DIVISION

TOM ALEXANDER, ET AL.           §
                                §
VS.                             §   CIVIL ACTION NO.4:08-CV-614-Y
                                §
HOLDEN BUSINESS                 §
FORMS, INC., ET AL.             §
```

## ORDER GRANTING MOTION TO DISMISS

Pending before the Court is the Motion to Dismiss (doc. #15) filed by third-party defendant Frost National Bank, N.A. ("Frost"). After review, the Court concludes that the allegations of defendant Holden Business Forms, Inc. ("Holden"), as third-party plaintiff, do not state a recognized claim under the Texas Uniform Fraudulent Transfers Act ("TUFTA"). Consequently, Frost's motion will be granted.

I.  Background

As set out in Holden's third-party complaint, in June 2002, the plaintiffs in this case leased property to Holden. In September 2007, Holden, under an asset purchase agreement, sold the business that it operated on the leased property to defendant NC Communications, LLC. ("NCC"). Under the agreement, Holden assigned and NCC assumed Holden's obligations under the lease, including the payment of rent, taxes, and the obligation to remove any lien affixed to the leased premises resulting from tenant occupancy of the premises. Holden also advanced to NCC $47,329.84 for ad valorem taxes, including $22,023.63 for personal property

and $25,306.21 for real property.

NCC was to hold these funds in trust until annual property taxes were assessed. But rather than use these funds to pay taxes, NCC used the funds to pay upon a loan from Frost that NCC secured near the time of the Holden-to-NCC transaction. Frost was apparently given a security interest in the personal property purchased by NCC from Holden. NCC's principals also personally guaranteed the repayment of Frost's loan to NCC.

According to Holden, aside from the obligations created by the agreement, NCC is indebted to Holden in various other ways. Holden claims to have provided NCC with additional goods and services after the agreement, including computers, software, and print jobs. NCC has also received payments for work performed by Holden before the agreement. Holden alleges that NCC is not entitled to these payments but has nevertheless retained them. These payments were also allegedly paid over by NCC to Frost.

Sometime in 2008, NCC's principals sold their ownership interest in NCC to third-party defendant Jim Moody. As part of that transaction, Moody executed an amendment to NCC's loan agreement with Frost whereby he assumed NCC's prior principals' obligation as the personal guarantor of the loan from Frost to NCC.

NCC failed to pay rent, taxes and other payments during 2008, resulting in the placement of a mechanic's and materialman's lien on the leased premises, and a demand by Plaintiffs on Holden and NCC for payment of all sums due under the lease. Tarrant County, Texas, also began proceedings to collect back taxes.

In late 2008, during a conference call among Plaintiffs, Holden, NCC, and Moody, Moody indicated that NCC was failing and that all income received by NCC was being used to pay its debt to Frost. NCC's assets were also being liquidated in an effort to pay down NCC's debt to Frost. Plaintiffs filed suit against Holden and NCC, alleging each had breached the lease agreement. Based on the various payments to Frost by NCC, Holden has filed third-party claims against Frost, as well as NCC, under Texas Business and Commerce Code ("the Code") sections 24.005(a)(2), 24.006(a), and 24.006(b), seeking to void the payments as fraudulent transfers. Frost now demands dismissal of the claims against it.

II. Discussion

    A.  Standard for Dismissal Under Fed. R. Civ. P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint that fails "to state a claim upon which relief can be granted." The Court must accept as true all well pleaded, non-conclusory allegations in the complaint and liberally construe the complaint in favor of the plaintiff. *Kaiser Aluminum*, 677 F.2d at 1050. The Court must also "limit [its] inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996).

The plaintiff must, however, plead specific facts, not mere conclusory allegations, to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). Indeed, the plaintiff

3

must plead "enough facts to state a claim to relief that is plausible on its face," and his "factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

Generally, Rule 12(b)(6) must be interpreted in conjunction with Rule 8(a), which sets forth the requirements for pleading a claim for relief in federal court. Rule 8(a) calls for "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) (holding Rule 8(a)'s simplified pleading standard applies to most civil actions). Where fraud is alleged, however, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) must be taken into account. Under Rule 9(b) the party alleging fraud must allege with specificity "the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).

At least one court has concluded that Rule 9(b) applies to claims brought under the TUFTA. *See Indiana Bell Telephone Co. Inc. v. Lovelady*, No. SA-05-CA-285-RF, 2006 WL 485305, at *1 (W.D. Tex. Jan. 11, 2006). But as argued by Holden, the court in *Lovelady* dealt with an allegation that the fraudulent transfer was made with an intent to defraud. *See id.* According to Holden,

4

*Lovelady* stands only for the proposition that Rule 9(b) applies to a claim under section 24.005(a)(1) which requires an allegation of intent. Holden insists that Rule 9(b) does not apply to claims under section 24.005(a)(2) or 24.006.

Whatever the scope of the court's decision in *Lovelady*[1], Holden's would seem to be the proper approach. A claim under section 24.005(a)(1) requires an allegation of "actual intent to hinder, delay, or defraud." *See* TEX. BUS. & COMM. CODE § 24.005(a)(1). Although termed "fraudulent" transfers, claims under section 24.005(a)(2) and 24.006(b) are based on "constructive fraud"[2] and require no allegations similar to common-law fraud as contemplated by Rule 9(b). *Cf. FTC Freecom Communs.*, 401 F.3d 1192, 1204 n.7 (10th Cir. 2005) (concluding that a claim under section 5 of the Federal Trade Commission Act did not fall under Rule 9(b) because "unlike the elements of common law fraud [the claimant] need not prove *scienter,* reliance, or injury" under section 5) (emphasis added). This is, however, a matter that has not been settled by the United States Court of Appeals for the Fifth Circuit and need not be resolved here. Holden has clarified that it is not making a claim under section 24.005(a)(1) against

---

[1] The court in *Lovelady* cites *Brunswick Corp. v. Vineberg*, 370 F.2d 605 (5th Cir. 1967) in support of the proposition that Rule 9(b) applies to claims brought under TUFTA. But just as does *Lovelady* itself, *Vineberg* deals with claims of intentional conduct engaged in to frustrate a creditor's attempt to collect on a debt. *See Vineberg*, 370 F.2d at 607.

[2] *See Williams v. Performance Diesel*, 2002 Tex. App. 2735, at *3-4 (Tex. App.--Houston [14th Dist.] Apr. 18, 2002, no pet.) (characterizing claims under sections 24.005(a)(2) and 24.006 as claims of "constructive fraud").

5

Frost.[3]  And the Court's decision regarding Holden's claims under sections 24.005(a)(2) and 24.006 does not turn on the sufficiency of Holden's pleading related to any fraudulent activity by Frost, NCC, or Moody.  Instead, the facts alleged by Holden do not state a claim against Frost under the law.

B.  Analysis

1.  Claims Under Sections 24.005(a)(2) and 24.006(a)

Holden's claims under sections 24.005(a)(2) and 24.006(a) require Holden to plead and prove that NCC, as the debtor that engaged in the allegedly fraudulent transfers, did not receive "reasonably equivalent value" as part of such transfers.  *See* TEX. BUS. & COMM. CODE § 24.005(a)(2) (transfer is fraudulent "if the debtor made the transfer or incurred the obligation . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation"); and § 24.006(a).  In seeking dismissal, Frost points out that the Code provides that "[v]alue is given for a transfer . . . if, in exchange for the transfer . . . antecedent debt is secured or satisfied."  TEX. BUS. & COMM. CODE § 24.004(b).  According to Frost, NCC was provided "value" in that its antecedent debt to Frost was satisfied as part of the transfers.  And as for whether such value was reasonably equivalent to what NCC transferred to Frost, Frost points to the Code's definition of

---

[3] Although Holden continues to cite to section 24.005(a)(1) in its Amended Answer and Third-Party Complaint (doc. #20 at 18, ¶79) in its response Holden explains that it is making no claims against Frost under this section. (Holden's Resp. Br., doc. #19 at 1 & n.1.)

6

"reasonably equivalent value." Texas law defines reasonably equivalent value as including, "without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." *Id.* at § 24.004(d). Frost insists that what NCC received is reasonably equivalent to what it surrendered because NCC received a dollar-for-dollar reduction of its debt to Frost in exchange for its transfers to Frost. Holden does not contest, in either its pleadings or briefing of the motion to dismiss, that NCC in fact received a dollar-for-dollar reduction of its debt.

Holden counters that the Court must look beyond the reduction in NCC's antecedent debt to determine whether NCC received reasonably equivalent value. The proper focus, Holden argues, "is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors." (Citing *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000).) Holden posits that "[i]n determining value, a court should examine all aspects of a transaction and both direct and indirect burdens to the debtor." *Smith v. Amer. Founders Fin., Corp.*, No. H-05-1779, 2006 U.S. Dist. LEXIS 74865, at *25 (S.D. Tex. Sept. 29, 2006). And although a debtor has the right to pay or secure its debt with a creditor with any of its property, *see Quinn v. Dupree*, 303 S.W.2d 769, 774 (Tex. 1957), Holden contends that a debtor may not do so "in fraud of the rights of other creditors." *Englert v. Englert*, 881 S.W.2d 517, 518 (Tex. App.--Amarillo 1994, no writ).

When this broader view of reasonably equivalent value is

taken, Holden argues that it is apparent that NCC did not receive reasonably equivalent value. Holden bases this on its contention that NCC made the contested transfers to Frost at Moody's direction in order to extinguish NCC's debt to Frost and thereby relieve Moody of his potential liability on his personal guarantee of NCC's indebtedness to Frost. Moody is alleged by Holden to be an "insider." Holden further avers that because NCC's funds were used to pay off its debt to Frost, NCC could not pay its other creditors.

But the fact that NCC made transfers or payments to Frost while not paying other creditors does not mean that NCC did not receive reasonably equivalent value. In examining all aspects of a transaction to assess value, "the issue is whether, from the creditor's standpoint, the estate lost value." *Smith*, 2006 U.S. Dist. LEXIS 74865 at *25 (citing *Nat'l Loan Investors, L.P. v. Robinson*, 98 S.W.3d 781, 784 (Tex. App.--Amarillo 2003, pet. denied). As Frost points out, whether payments are made solely to one creditor or spread out among multiple creditors, the amount by which the estate is reduced is the same. The question is "whether there is a reasonable and fair proportion between what the debtor surrendered and what the debtor received in return." *Id.* at *26. Thus, Holden's complaint that transfers were made to only one creditor does not detract from the value that NCC, as the debtor, received for such claims. Indeed, Holden has not pointed to a single case in which it was determined that a debtor had not received reasonably equivalent value merely because the debtor had

8

made transfers to fewer than all creditors.

This is likely because under Texas law the mere fact that one creditor receives payments while other creditors go unpaid indicates neither fraudulent intent nor a lack of reasonably equivalent value.  In *Quinn v. Dupree*, a case relied on by both sides, the Supreme Court of Texas explains

> In the absence of a law declaring preferences invalid . . . every debtor has the right to pay or secure one or more of his just debts with any property he has, provided that no more property is transferred than is reasonably necessary to pay or secure the debt.  A mere intention to prefer one creditor over the other thus will not vitiate the transaction, and the conveyance or security instrument will not be held void as to creditors unless it was executed with fraudulent intent or amount to a fraud in law.

*Quinn*, 303 S.W.2d at 744.  In a previous case, the court stated:

> It is settled law in this State that a creditor may receive payment of an honest debt in property of his debtor though he may know at the time that the debtor's intent in making the payment is to prefer him and to place the property beyond the reach of other creditors, provided that no more property is taken than is reasonably necessary to pay his debt. Every payment of a debt by an insolvent, whether the payment be made in money or property, tends in a popular sense, to hinder, delay or defraud other creditors in the collection of their respective debts. In the absence of a law declaring preferences invalid, every debtor has the legal right to pay one or more of his just debts with any money or property he has.  The intent to hinder, delay or defraud creditors in the sense inhibited by [the law at issue] cannot exist when the purpose and effect of the transfer of property is to apply it at its fair value to the satisfaction of a just debt and it is so received by the debtor.

*Adams v. Williams*, 112 Tex. 469, 476-77, 248 S.W. 673, 676 (Tex. 1923).  These principles remain valid notwithstanding the enactment of TUFTA as part of the Code.  *See Bossier Bank & Trust Co. v. Phelan*, 615 S.W.2d 872, 874 (Tex. App.–Houston [1st Dist.] 1981,

writ ref'd n.r.e.) (noting the exception to TUFTA's predecessor which allows a debtor to make preferential transfers otherwise allowed by law); *see also Kaufman v. Morales*, 93 S.W.3d 650, 656 & n.3 (Tex. App.--Houston [14 th Dist.] 2002, no pet.) (noting a debtor's right, as announced in *Adams,* to pay his debts in the order he chooses); *Englert*, 881 S.W.2d at 519 (stating TUFTA did not alter basic principles announced in cases such as *Quinn*).

Holden has not pointed to any law that barred NCC's making admittedly preferential transfers to Frost. Nor has Holden alleged the sort of fraudulent intent necessary under *Adams* and *Quinn* to invalidate NCC's preferential transfers. Holden has alleged that NCC, at the direction of Moody, made payments to Frost to relieve Moody of his personal guaranty of NCC's debt to Frost. (Doc. #20 at p.18, ¶79.) Thus, Holden has effectively admitted that both the purpose and effect of the challenged transfers was to pay down NCC's debt to Frost. Finally, although Holden alleges that NCC's transfers to Frost exceeded the mandatory monthly payment under the financing agreement, Holden has not alleged that NCC's transfers to Frost were in excess of what was reasonably necessary to pay NCC's debt.

As for Holden's complaint that the payments benefitted Moody, that fact does not support the contention that NCC did not receive reasonably equivalent value. In its complaint and briefing, Holden argues that because Moody personally guaranteed NCC's indebtedness to Frost, he should be treated as NCC's creditor and that the transfer to Frost also effected a transfer to Moody in that

10

satisfaction of NCC's debt to Frost reduced Moody's exposure to personal liability. To the extent that Moody should be treated as a creditor and transferee of NCC, a transfer to Moody would be treated the same as the transfer to Frost. That is, if NCC is deemed to have made a transfer to Moody in satisfaction of an antecedent debt, the issue becomes whether Moody provided reasonably equivalent value to NCC as part of the transfer or whether the transfer to Moody is otherwise fraudulent. Regardless, under this theory Holden's claim is against Moody, as the recipient of the purported transfers, not Frost. *Cf.* TEX. BUS. & COMM. CODE § 24.008 (allowing a prevailing claimant to avoid the challenged transfer or attach the asset transferred or property of the transferee).

Holden's only allegations in support of its contention that NCC did not receive reasonably equivalent value in connection with the transfers to Frost are that the transfers by NCC benefitted Moody and reduced NCC's ability to pay other creditors. The fact that the transfers to Frost can be seen as having benefitted Moody do not state a claim against Frost. And as discussed above, NCC's failure to pay other creditors does not support, as an element of Holden's section 24.005(a)(2) and 24.006(a) claims, that NCC did not receive reasonably equivalent value. Holden, therefore, makes no allegations that are actionable under sections 24.005(a)(2) and 24.006(a), the Court concludes that Holden has failed to state a claim under these sections. These claims will be dismissed.

11

    2. Claim Under Section 24.006(b)

 Section 24.006(b) provides "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent." T<small>EX</small>. B<small>US</small>. & C<small>OMM</small>. C<small>ODE</small> § 24.006(b). Frost argues that this claim must fail because Frost is not an insider.

 Texas Business and Commerce Code § 24.002(7), in relevant part, defines an "insider" as "(i) a director of the debtor; (ii) an officer of the debtor; (iii) a person in control of the debtor; (iv) a partnership in which the debtor is a general partner; (v) a general partner in a partnership described in subparagraph (iv) of this paragraph; or (vi) a relative of a general partner, director, officer, or person in control of the debtor." T<small>EX</small>. B<small>US</small>. & C<small>OMM</small>. C<small>ODE</small> § 24.002(7)(B). Holden's complaint does not allege that Frost matches any of these definitions in regard to NCC. And Holden does not argue that Frost is an insider under this definition. Because section 24.006(b) applies only to a transfer to an insider, and because Holden has failed to allege that Frost is an insider, Holden has failed to state a claim under section 24.006(b) against Frost. Consequently, this claim will be dismissed.

 Again, the Court notes that Holden theorizes that NCC's transfers to Frost amounted to transfers to Moody because to the extent that NCC's debt to Frost was satisfied, Moody's exposure to liability on his personal guaranty was reduced. And in relation to

12

section 24.006(b), Holden alleges that Moody is an "insider." But even granting that the reduction in Moody's exposure to personal liability is a "transfer" to Moody for the purposes of the TUFTA, Holden's cause of action is against Moody, not Frost. The language of the insider-transfer provision dictates as much, stating that "[a] transfer made by a debtor is fraudulent" if, inter alia, "the transfer was made *to an insider*." TEX. BUS. & COMM. CODE § 24.006(b).

### 3. Propriety of Frost as Party to Impose Remedy

Holden seeks various remedies under sections 24.008(a) and 24.011 of the Code. In relation to Frost, these remedies include avoidance of the challenged transfers by NCC to Frost, imposition of a constructive trust on funds transferred by NCC to Frost, and appointment of a receiver to, among other things, oversee the distribution of funds recovered from Frost to Holden for any amounts NCC is determined to owe Holden. But as has been established, NCC was entitled to make payments on its debt to Frost and Frost was within its rights to accept such payments. As has been further established, to the extent that the transfers to Frost could be seen as transfers to Moody, as guarantor and creditor of NCC, Holden's cause of action, if any, is against Moody.

Holden's recovery must also be against Moody. Section 24.008 of the Code provides for various remedies in the event a fraudulent transfer is proven. *See* TEX. BUS. & COMM. CODE § 24.008. Each of these remedies is directed at the property involved in the challenged transfer or recovery of the value of such property from

13

the transferee. *See id.* (allowing avoidance of the challenged transfer, attachment of the challenged asset, appointment of a receiver to take charge of the asset transferred or other property of the transferee, or execution on the asset transferred). None of these remedies reach property held by an innocent third party as the result of an otherwise valid transfer. *Cf. id.; also see First Nat'l Bank v. Skidmore*, 267 S.W. 1051, 1055 (Tex. Civ. App.--Amarillo 1924, no writ) (setting aside a fraudulent conveyance restores the respective rights of the transferor and the complaining creditor as against each other); *cf. In re MortgageAmerica Corp.*, 714 F.2d 1266, 1272 (noting that the remedy afforded under Texas's fraudulent transfer law "related entirely to the debtor's fraudulently transferred property" and that "the debtor's wrongfully transferred or secreted property . . . when found, may be seized and executed upon").

The conclusion that funds transferred by NCC to Frost cannot be recovered from Frost despite the fact that they may have been entrusted to NCC for specific purposes, were wrongfully in NCC's possession and misused by NCC, or were transferred with an intent to avoid payment to other creditors may not seem equitable. But the Court's conclusion does not mean that funds transferred to third parties are beyond recovery. Rather, the Court's conclusion is based on Holden's failure to point to any legal basis authorizing, or make factual allegations supporting, a recovery against Frost. *Cf. Guaranty Bank v. Nat'l Surety Corp.*, 508 S.W.2d 928, 932 (Tex. Civ. App.--Dallas 1974, writ ref'd n.r.e.) (bank

could be held liable for trustee's personal use of trust funds if bank knew of trustee's improper use of funds at the time bank received the funds); *Ginther v. Taub*, 675 S.W.2d 724, 728 (Tex. 1984) (upholding the imposition of constructive trust on third party where third party was aware of the transferor's fraud); 72 TEX. JUR. TRUSTS § 213 ("As an alternative to a judgment in personam against the transferee of property conveyed in breach of trust, the beneficiary may, at his or her election, sue for the recovery of such trust property from the transferee, provided that he or she is not a bona fide purchaser and that the property is identifiable.") (citing various Texas cases).  Based on the law as argued by the parties and the facts alleged by Holden, the Court concludes that Holden's allegations do not state a claim against Frost under the Texas Uniform Fraudulent Transfers Act.

III.  Conclusion

  Accordingly, Holden's claims against Frost are DISMISSED.

  SIGNED May 20, 2009.

                  */s/ Terry R. Means*
                  TERRY R. MEANS
                  UNITED STATES DISTRICT JUDGE